United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER WOJCIECHOWSKI,<br><br>Plaintiff,<br><br>v.<br><br>KOHLBERG VENTURES, LLC,<br><br>Defendant. | Case No. 16-cv-06775-TSH<br><br>**ORDER RE: MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 91 |

## I.    INTRODUCTION

Pending before the Court is Defendant Kohlberg Ventures, LLC's ("Kohlberg Ventures")
Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.  ECF No. 91.
Plaintiff Peter Wojciechowski, on behalf of himself and a certified class (referred to here
collectively as "Wojciechowski"), filed an Opposition, ECF No. 97, and Defendant filed a Reply.
ECF No. 99.

In his Complaint, ECF No. 1, Wojciechowski seeks to recover damages for alleged
violations of the Worker Adjustment and Retraining Notification Act (the "WARN Act" or the
"Act"), 29 U.S.C. §§ 2101–2109.  He alleges that Kohlberg Ventures, his employer ClearEdge
Power, LLC ("CEP LLC") and its owner, ClearEdge Power, Inc. ("CEP Inc.") (collectively
referred to herein as "ClearEdge") constitute a "single employer" under the WARN Act and are
liable for violation of the Act's notice requirement.  Kohlberg Ventures, by this motion, seeks
summary judgment against Wojciechowski on the grounds that "single employer" status is not a
basis for imposing joint liability under the WARN Act, and that, in any event, Kohlberg Ventures
was not Wojciechowski's employer.  Having considered the parties' positions, relevant legal
authority, and the record in this case, the Court **GRANTS** Kohlberg Ventures' motion.

1

## II.   BACKGROUND

2
**A.   The Parties**

3
CEP LLC was formerly known as ClearEdge Power Corporation and, before then, was

4
known as UTC Power Corporation.  Declaration of John S. Eastburn, Jr. in support of Defendant

5
Kohlberg Ventures, LLC's Motion for Summary Judgment ("Eastburn Decl.") ¶ 5.  CEP Inc., a

6
single member Delaware limited liability company, is the sole member of CEP LLC, meaning

7
CEP Inc. owned 100% of CEP LLC.  *Id*.  The executive officers of CEP Inc. managed CEP LLC.

8
*Id*.  CEP LLC was headquartered at 195 Governor's Highway in South Windsor, Connecticut.  *Id*.

9
CEP Inc. was an Oregon corporation with its headquarters at 920 Thompson Place, Suite

10
100, Sunnyvale, California in 2013.  Declaration of Shelley Hilderbrand in support of Defendant

11
Kohlberg Ventures, LLC's Motion for Summary Judgment ("Hilderbrand Decl.") ¶ 2.  Prior to

12
that time, ClearEdge's headquarters was located in Hillsboro, Oregon.  *Id*.

13
In February 2013, CEP Inc. acquired UTC Power Corporation, a subsidiary of United

14
Technologies Corporation.  *Id*.  Following the acquisition, ClearEdge manufactured 400 kilowatt

15
("kW") high temperature phosphoric acid fuel cells ("PAFCs") for commercial and residential

16
applications at its two facilities in South Windsor, Connecticut ("South Windsor Facilities").  *Id*. ¶

17
3.  ClearEdge was the employer of record of the South Windsor Facilities employees and issued

18
employee paychecks and W2 forms.  *Id*.  Neither CEP LLC nor CEP Inc. are defendants in this

19
case.  *See* Complaint, ECF No. 1.

20
Kohlberg Ventures is a limited liability company that operates as a venture capital firm that

21
invests its own capital in, among other things, early stage cleantech companies.  Eastburn Decl. ¶

22
3.  James Kohlberg is a Co-Founder and sole Member (owner) of Kohlberg Ventures.  *Id*. ¶ 6.

23
John S. Eastburn Jr. is a Co-Founder and Manager of Kohlberg Ventures.  *Id*. ¶ 1.  Kohlberg

24
Ventures' corporate address is and at all times was 3000 Alpine Road, Portola Valley, CA.  *Id*. ¶ 3.

25
Kohlberg Ventures never has manufactured any products, nor has it ever had officers or directors.

26
*Id*.  Neither CEP Inc. nor CEP LLC was a subsidiary of Kohlberg Ventures.  *Id*. ¶ 8.

27
In February 2013, Kohlberg Ventures made its only investment in CEP Inc. by purchasing

28
Series F stock, after which Kohlberg Ventures owned approximately 3% of the total outstanding

United States District Court
Northern District of California

2

shares of CEP Inc.  *Id.* ¶ 4; Declaration of Rene S. Roupinian in support of Plaintiff's Opposition to Defendant's Motion to Dismiss ("Roupinian Decl.") Ex. 2.  At the time of the employment terminations at issue in this case, various entities controlled by James Kohlberg owned a total of approximately two-thirds of CEP Inc. stock.  Eastburn Decl. ¶ 4; Roupinian Decl., Ex. 2.  These entities, each of which James Kohlberg was either the sole owner or controlling shareholder, were: The James A. Kohlberg Revocable Trust, Bay Area Holdings Inc., KCEP Acquisition Company LLC, KCEP 2 Acquisition Company LLC (collectively known as "Kohlberg Entities"), in addition to the shares owned by Defendant Kohlberg Ventures LLC.  Eastburn Decl. ¶ 4; Roupinian Decl., Ex. 2.

Kohlberg Ventures has never had an ownership interest in or right to control any of these Kohlberg Entities.  Eastburn Decl., ¶ 4.  Nonetheless, in a March 30, 2014 letter to Samsung Everland, a potential ClearEdge customer, Kohlberg stated that "As you may know, Kohlberg Ventures, LLC and its affiliates ('KV') is the majority shareholders of ClearEdge, in which we began investing in 2004. Over this period, KV has invested over $130,000,000 million in the company."  Roupinian Decl. Ex. 1.  On March 10, 2014, Kohlberg Ventures loaned $5 million dollars to CEP Inc. to address CEP Inc.'s near-term financing needs.  Eastburn Decl. ¶ 12.  Thus, Kohlberg Ventures' financial involvement with ClearEdge was limited to its Series F investment in and subsequent $5 million loan to CEP Inc.  *Id*. ¶ 8.  Neither CEP Inc. nor CEP LLC was a subsidiary of Kohlberg Ventures.  *Id*.

Wojciechowski was an employee of ClearEdge in its South Windsor Facilities.  On or about April 25, 2014, ClearEdge terminated Wojciechowski without notice.  Six days later, on May 1, 2014, ClearEdge filed for bankruptcy.

**B.     Procedural History**

Wojciechowski filed an adversary class action against ClearEdge in bankruptcy court, alleging that CEP LLC and CEP Inc. were a "single employer" under the WARN Act and that it violated the Act when it fired him and other employees without the sixty day advance notice required by the Act.  Wojciechowski entered into a settlement agreement with both ClearEdge entities in which he and the class released all claims they had against them and their respective

estates, "excluding any third parties which may or may not be affiliated with Defendants ClearEdge Power, Inc. and ClearEdge Power LLC, including but not limited to Kohlberg Ventures LLC." Kohlberg Ventures was not involved in the bankruptcy proceedings or in settlement negotiations. The bankruptcy court approved the settlement agreement, the ClearEdge bankruptcy estate paid a portion of the class members' WARN Act wages and benefits, and the case closed soon thereafter.

Wojciechowski then filed this putative class action on November 11, 2016, ECF. No. 1, seeking from Kohlberg Ventures, as a "single employer" with ClearEdge, an award for the balance of the WARN Act wages and benefits, i.e., what the Class is owed under the Act less the amount received from the ClearEdge estate. On February 7, 2017, Kohlberg Ventures moved to dismiss Wojciechowski's claim on the basis of claim preclusion, ECF No. 20, and, on April 11, 2017, the district court granted Kohlberg's motion with prejudice. ECF No. 35.

The Ninth Circuit reversed. In *Wojciechowski v. Kohlberg Ventures, LLC*, 923 F.3d 685 (9th Cir.), *cert. denied sub nom. Kohlberg Ventures, LLC v. Wojciechowski*, 140 S. Ct. 491, 205 L. Ed. 2d 319 (2019), the Ninth Circuit held that claim preclusion does not bar Wojciechowski's current claim because the settlement agreement — in particular, the intent of the settling parties — determines the preclusive effect of the previous action and the settlement agreement explicitly did not release Wojciechowski and the class' claims against Kohlberg. ECF Nos. 41 and 44. The Ninth Circuit stated in a footnote that, while liability under the WARN Act extends only to a person's "employer," 29 U.S.C. § 2104(a)(1), the term "employer" may include "parent and subsidiary companies 'depending on the degree of their independence' from one another and considering '(i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.'" *Wojciechowski*, 923 F.3d at 688, n.3, (citing *Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1006 (9th Cir. 2004), quoting *Int'l Bd. of Teamsters v. Am. Delivery Serv. Co.*, 50 F.3d 770, 775 (9th Cir. 1995)).

On May 8, 2019, the case was remanded and reassigned to the undersigned. ECF No. 42. On November 4, 2019, Wojciechowski's Class Certification Motion was granted, certifying a

1   class comprised of Wojciechowski and all similarly situated former employees who worked at or

2   reported to one of ClearEdge Power's Facilities in Connecticut, who were terminated without

3   cause on or about April 25, 2014 and within 30 days of that date or who were terminated without

4   cause as the reasonably foreseeable consequence of the mass layoffs and/or plant closings ordered

5   on or about April 25, 2014.  ECF No. 61.

6         Kohlberg Ventures has made the instant motion seeking an order granting summary

7   judgment as a matter of law on the grounds that "single employer" status is not a basis for

8   imposing joint liability pursuant to the WARN Act and that, in any event, Kohlberg Ventures was

9   not the employer of Wojciechowski or the class.

10  **C.**   **Factual Background**

11       **1.**   **Nature of the relationship between ClearEdge and Kohlberg Ventures**

12        Kohlberg Ventures avers that the day-to-day management of ClearEdge's business was

13  controlled by CEP Inc.'s officers and managers under the leadership of David Wright, the Chief

14  Executive Officer ("CEO") of CEP Inc.  Hilderbrand Decl. ¶ 8; Eastburn Decl. ¶ 9.  However, it is

15  undisputed that Kohlberg Ventures Manager Eastburn twice served as the interim Chief Operating

16  Officer ("COO") of CEP Inc.  From January to April 2012, Eastburn was hired by then-CEO Russ

17  Ford to be the interim COO.  Eastburn Decl. ¶ 6.  On or around April 7, 2014, following the

18  resignation of ClearEdge's COO Joseph Triompo, Eastburn again became CEP Inc.'s interim

19  COO and President for approximately three weeks until ClearEdge's bankruptcy filing on May 1,

20  2014.  *Id*.

21        Other than Eastburn, Kohlberg Ventures asserts that neither Kohlberg, nor any other

22  Kohlberg Ventures or Kohlberg Entities employees or representatives were officers or employees

23  of ClearEdge.  *Id*.  Even so, Wojciechowski claims that Eastburn was involved in the day-to-day

24  operations and management of ClearEdge by (1) preparing bonus recommendations for ClearEdge

25  employees, which Kohlberg Ventures asserts was in his capacity as one of three members of the

26  Compensation Committee of the ClearEdge Board of Directors (the "ClearEdge Board" or the

27  "Board"), Reply Declaration of John S. Eastburn, Jr. in support of Defendant's Motion for

28  Summary Judgment ("Eastburn Reply Decl.") ¶ 6, Roupinian Decl., Ex. 4, (2) setting agendas for

ClearEdge board meetings, which Kohlberg Ventures asserts was part of his role as Secretary and for ClearEdge management meetings after he became interim COO and President in April 2014, and (3) advising on next steps regarding ClearEdge's intellectual property counsel in a April 30, 2014 email, Roupinian Decl. Ex. 4, which Kohlberg Ventures asserts was performed as ClearEdge's interim COO and President, with the knowledge of ClearEdge's Chief Financial Officer, Gloria Fan, and only because ClearEdge's in-house counsel, Jennifer Adamy, was no longer employed by ClearEdge.  Roupinian Decl. Ex. 4, Eastburn Reply Decl. ¶ 9.

Kohlberg Ventures asserts that ClearEdge's CEO David Wright did not work for Kohlberg Ventures or any entity affiliated with James Kohlberg.  Eastburn Decl. ¶ 9.  Wojciechowski disputes this, claiming that Wright's employment was ultimately controlled by James Kohlberg, who directed his firing.  Roupinian Decl. Ex. 5.  On March 31, 2014, Kohlberg and Steven Gerbsman of Gerbsman Partners, an independent consultant engaged by the Board to assist with bankruptcy preparations, had an email exchange where Kohlberg's opinion and decision was sought concerning Wright's retention or termination.  *Id.*

### 2. Constitution of ClearEdge Board

James Kohlberg was the Chairman of the ClearEdge Board beginning in 2004 and remained in that position until after ClearEdge's bankruptcy filing in 2014, but he was not an officer or employee of either CEP Inc. or CEP LLC.  Eastburn Decl. ¶ 6.  On September 26, 2006, John Eastburn became a Member of the ClearEdge Board and remained a Board member until after ClearEdge's bankruptcy filing in 2014.  *Id.*  On January 22, 2008, the ClearEdge Board appointed Eastburn as its Secretary.  *Id.*

 As of February 18, 2014, two of the three seats on the ClearEdge Board's executive and compensation committees were held by Kohlberg Ventures' Kohlberg and Eastburn and Kohlberg Ventures held one of the three seats on both the Board's nominating committee and audit committee by Kohlberg and Eastburn, respectively.  Roupinian Decl. Ex. 18.

During 2013 and 2014, there were five other members of the ClearEdge Board in addition to John Eastburn and James Kohlberg:  Frank Marshall, Phil Angelides, Kenneth DeFontes, Andy Geisse, and David B. Wright.  Eastburn Decl. ¶ 7.  Kohlberg Ventures states that Marshall,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Angelides, DeFontes, Geisse, and Wright were selected as Board members based on their subject

2    matter expertise and perceived value to ClearEdge.  *Id.*  None of them were ever employed or

3    retained by Kohlberg Ventures or any Kohlberg Entity.  *Id.*  An outside search firm was retained

4    to locate potential Board members and it recommended DeFontes.  *Id.*  Kohlberg Ventures

5    contends that, as a result, a supermajority of the ClearEdge Board of Directors – five of the seven

6    members – was unaffiliated with Kohlberg Ventures or James Kohlberg.  *Id.*  Eastburn avers that

7    neither he, Kohlberg Ventures, James Kohlberg, nor any entity affiliated with James Kohlberg had

8    an agreement with any member of the ClearEdge Board to vote any particular way on matters

9    subject to a ClearEdge Board vote.  *Id.* ¶ 10.

10    Nevertheless, Wojciechowski asserts that Board members Angelides, Geisse and Wright

11    had prior business and/or personal relationships with Kohlberg and were recommended to join the

12    ClearEdge board by Kohlberg.[1]  Roupinian Decl. Ex. 7, Kohlberg Depo. 33:2-34:5, 35:3-15;

13    Roupinian Decl. Ex. 8, Kohlberg Depo. 30:15-31:23.

14    Wojciechowski further claims that ClearEdge's board of directors failed to observe

15    corporate formalities, including operating without board committees, Roupinian Decl. Ex. 18, and

16    keeping minutes of its meetings.  Roupinian Decl. Ex. 17.  Kohlberg Ventures objects that the

17    email Wojciechowski relies upon shows only that Eastburn said he did not have certain

18    ClearEdge's Board minutes in his possession.  Kohlberg Ventures further asserts that ClearEdge

19    maintained minutes of its Board meetings since at least 2006 through 2013 and that it previously

20    had Board committees and re-started them in February 2014.  Eastburn Reply Decl. ¶ 2.

21          **3.     No Shared Personnel or Human Resources Policies**

22    ClearEdge had its own Human Resources department and employed its own Human

23    Resources staff that did not work for or provide services to Kohlberg Ventures.  Hilderbrand Decl.

24    ¶ 6; Eastburn Decl. ¶ 9.  At various times, ClearEdge had a Vice President of Human Resources

25    who, along with the Human Resources department, managed ClearEdge's labor relations.

26

27    _____

28    [1] Wojciechowski claims Kohlberg was also responsible for Frank Marshall being on the
ClearEdge Board, but Kohlberg testified that Marshall was "connected to the company before our
investment."  Kohlberg Depo. 34:22-35:2.

Eastburn Decl. ¶ 9.  Neither Kohlberg Ventures nor any entity affiliated with James Kohlberg ever shared a human resource information system or other personnel, benefits, recordkeeping, or payroll system with ClearEdge, nor otherwise had any shared or common personnel practices. Hilderbrand Decl. ¶ 6, Eastburn Decl. ¶ 9.

ClearEdge maintained an employee handbook that established the employment terms and conditions governing its employees.  Hilderbrand Decl. ¶ 8.  Kohlberg Ventures was not involved in the drafting or enforcement of the ClearEdge employee handbook.  *Id*. Neither Kohlberg Ventures nor any entity affiliated with James Kohlberg ever had a Shared Services Agreement with ClearEdge.  Eastburn Decl. ¶ 9.  ClearEdge employed its own in-house legal counsel, Jennifer Adamy, who was based in South Windsor, Connecticut.  Hilderbrand Decl. ¶ 6; Eastburn Decl. ¶ 9.

Kohlberg Ventures and ClearEdge did not jointly train their employees, nor did they share training or instruction policies or practices.  Hilderbrand Decl. ¶ 6.  ClearEdge trained its own employees without assistance from Kohlberg Ventures.  *Id*.  Neither Kohlberg Ventures nor any entity affiliated with James Kohlberg ever had any involvement in hiring, training, disciplining or supervising ClearEdge employees or otherwise provided training or instruction policies or practices.  Eastburn Decl. ¶ 8.  At no time did Kohlberg Ventures employ, retain or utilize any ClearEdge employee to provide services at Kohlberg Ventures.  *Id*. ¶ 9.

Kohlberg Ventures asserts that ClearEdge controlled all of its own labor and employee relations without involvement by Kohlberg Ventures, Eastburn Decl. ¶ 8, and that ClearEdge was not required to and did not seek approval from Kohlberg Ventures before making operational or employee relations related decisions, including the hiring and firing of employees.  Hilderbrand Decl. ¶ 7.  Any activities performed on behalf of ClearEdge, Kohlberg Ventures states, were performed in the capacity of Kohlberg and Eastburn as ClearEdge Board members (and for Eastburn as interim COO and President after April 7, 2014) and alongside other Board members. Roupinian Decl. Ex. 33; Eastburn Reply Decl. ¶ 8.

### 4.     Operational Connections Between ClearEdge and Kohlberg Ventures

Neither Kohlberg Ventures nor any entity affiliated with James Kohlberg ever shared

8

administrative or purchasing systems with ClearEdge, ever interchanged supervisors or equipment with ClearEdge, or ever commingled finances with ClearEdge.  Hilderbrand Decl. ¶ 6; Eastburn Decl. ¶ 9.  Neither Kohlberg Ventures nor any entity affiliated with James Kohlberg ever had joint bank accounts with ClearEdge nor did the businesses have the ability to access each other's bank accounts or finances.  Eastburn Decl. ¶ 9.  Neither Kohlberg Ventures nor any entity affiliated with James Kohlberg ever served as a guarantor of loans or credit extended to ClearEdge, or vice versa, *id*. ¶ 10, nor did they own any real property or equipment together with ClearEdge, nor did they rent or lease real property or equipment to or from ClearEdge.  Hilderbrand Decl. ¶ 7; Eastburn Decl. ¶ 9.  ClearEdge did not purchase goods from or sell goods to Kohlberg Ventures, nor did it share equipment or other property with Kohlberg Ventures.  Hilderbrand Decl. ¶ 7.

 Kohlberg Ventures asserts that neither it nor any entity affiliated with James Kohlberg ever had any involvement in writing, approving, or negotiating purchase orders, bidding on projects, approving projects, facilitating sales, or procuring equipment or materials for ClearEdge. Hilderbrand Decl. ¶ 7; Eastburn Decl. ¶ 8.  Other than during the time Eastburn was appointed Interim COO and President between April 7, 2014 and May 1, 2014, he did not have or perform an operational role with ClearEdge.  Eastburn Reply Decl. ¶ 4.

Wojciechowski, for his part, asserts that in 2014, Eastburn was involved in the operations of ClearEdge, including management of the sales process and contractors.  He points to an email to ClearEdge personnel on March 10, 2014 in which Eastburn wrote: "I've been asked to review the cycle – what we buy, from whom, controls, how we change part #s, inventory, required purchasing timeframes etc.  In our meeting I'd like to dig in to the relevant processes, review the agreements with our vendors, understand your organization, map to engineering resources etc." Roupinian Decl. Ex. 9.

Leading up to the decision to file bankruptcy, Eastburn and Kohlberg along with ClearEdge's CFO created "Plan C," an operational plan to achieve profitability by January 2015 by implementing cost reductions of between 30-50% in all areas, including plant overhead, service and installation, research and development, and sales.  Roupinian Decl. Ex. 9.  In March and April 2014, Eastburn was involved in cost analysis of ClearEdge's equipment, installation and payments

9

United States District Court
Northern District of California

1  processes, and discussions of pricing for parts, and he directed ClearEdge payments to vendors.

2  *Id.*  Eastburn was also involved in discussions about how to convince ClearEdge's vendors to

3  resume business with ClearEdge.  *Id.*

4       On March 24, 2014, Eastburn sent out an email relaying what was discussed during a

5  Board call and outlining a "Go Forward Action Plan" that directed ClearEdge's top executives to

6  call on ClearEdge's twenty most critical vendors/creditors and to follow up with updates.  *Id.*  For

7  the initial call Eastburn wrote out a three-paragraph script that he instructed the three Chief

8  Officers of ClearEdge to read to vendors/creditors to "stabilize" them.  *Id.*

9       **5.**   **Demise of ClearEdge**

10      ClearEdge was not generating cash flow from its operations sufficient to sustain its

11 operations and growth and thus required occasional infusions of new equity or debt financing.

12 Eastburn Decl. ¶ 11.  In January 2014, ClearEdge engaged Robert W. Baird & Co. Incorporated

13 ("Baird"), a major investment capital firm, to raise new equity capital.  *Id.* ¶ 12.  On March 10,

14 2014, Kohlberg Ventures loaned CEP Inc. $5 million to address CEP Inc.'s near-term financing

15 needs.  *Id.*

16      ClearEdge management provided projections to the Board at a March 17, 2014 meeting

17 reflecting an expected cash shortfall in April 2014 due, in part, to expected sales being delayed to

18 the May/June 2014 timeframe.  *Id.* ¶ 13.  At that time, ClearEdge was negotiating for financing

19 with affiliates of Macquarie Group Limited, an Australian multinational investment bank and

20 financial services company ("Macquarie"), for a $20 million loan and with two entities affiliated

21 with James Kohlberg for a $25 million loan ("Loan Proposals").  *Id.*  Both Loan Proposals were

22 subject to conditions precedent that ultimately were not satisfied.  *Id.*  The Loan Proposal by the

23 two entities affiliated with James Kohlberg was subject to three conditions: (1) a firm purchase

24 order regarding a Samsung Everland project in South Korea with KHNP, a condition that was also

25 part of the Macquarie Loan Proposal;[2] (2) the Macquarie affiliate $20 million loan funding; and

26

27 [2] The Macquarie loan did not originally include the same requirement as the Kohlberg-affiliated
   entities that Samsung remove a contingency clause in its order.  However, after its initial decision
28 to provide $20 million in financing to ClearEdge, Macquarie subsequently made its financing
   offer subject to the two Kohlberg Affiliates providing their $25 million financing with the

1    (3) a purchase order from Verizon for a minimum of ten ClearEdge units.  *Id.* ¶ 14. These three

2    funding conditions were not satisfied and the two entities affiliated with James Kohlberg did not

3    provide the loan.  *Id.*

4            With regard to the first financing condition, on March 20, 2014, ClearEdge signed an

5    equipment purchase order with Samsung Everland in South Korea for 70 fuel cell units amounting

6    to approximately $101,000,000 in new business.  *Id.* ¶ 15. However, the Samsung Everland

7    purchase order contained a "Contingency Covenant," which required that a public works project in

8    South Korea known as the "Busan Project" had to have been officially approved by the local

9    South Korean governmental entity ("KHNP") and a Special Purpose Company be formed among

10   Samsung Everland, the government entity and the local power utility in order for the Samsung

11   Everland purchase order to be effective.  *Id.*  The Contingency Covenant provided that, unless

12   Busan Project was officially approved, the Samsung Everland purchase order was "void."  *Id.*

13          In anticipation of the March 22, 2014 Board meeting, Eastburn provided the Board with an

14   agenda that included a breakdown of Dorsey & Whitney LLP's ("Dorsey's") billable rates for the

15   Board's consideration depending on whether the law firm would be retained for advice only or for

16   the restructuring of the company, i.e., bankruptcy.  Eastburn Reply Decl. Ex. A.  The agenda also

17   provided some brief notes regarding why Dorsey was being recommended, including that the

18   partners had been practicing for over twenty years, they had labor counsel as part of their staff,

19   and they were recommended by Board advisor Gerbsman.  Resumes of the Dorsey attorneys were

20   attached to the agenda email for the Board's review and consideration.  *Id.*  On March 24, 2014,

21   only after the Board meeting, Eastburn asked Dorsey bankruptcy attorney Stephen T. O'Neill

22   ("O'Neill") to send an engagement letter.  Roupinian Decl. Ex. 6.  On March 27, Kohlberg

23   authorized the retention of O'Neill as insolvency counsel.  Roupinian Decl. Ex. 25.

24   Wojciechowski, however, asserts that Eastburn and Kohlberg directed O'Neill's retention without

25   input from other members of the ClearEdge Board.  *Id.*

26          In late March 2014, Neal Starling, ClearEdge's Vice President of Sales and Marketing,

27

28   ――――――――――――――――
     Kohlberg affiliates' contingencies satisfied.  Eastburn Reply Decl. ¶ 14 & Ex. E.

CEO Wright, and Eastburn traveled to South Korea to negotiate with Samsung Everland for the removal of the Contingency Covenant.  Eastburn Decl. ¶ 16.  This Samsung could not do. Consequently, on March 31, 2014, Kohlberg sent an email to Eastburn saying, "Time to file, Come home."  Roupinian Decl. Ex. 26.  That same day, Kohlberg emailed O'Neill telling him to prepare to file for bankruptcy for ClearEdge.  Roupinian Decl. Ex. 12.  Kohlberg then emailed the Board to tell them he advised bankruptcy counsel to begin preparations file and said the Board would "approve the necessary resolutions" at the meeting the next day.  *Id*. Ex. 15.

Wright replied to Kohlberg and the Board the same day, saying he was "very disappointed that we announced the company closing via email prior to holding the board meeting."  *Id*. Ex. 14. He stated that "the company closure [ ] should have been a Board decision" and ended by repeating that he was "extremely disappointed at this decision."  *Id*.  Wright followed this with another email to Kohlberg in which he wrote "Jim, I am absolutely amazed you made this decision without looking at alternatives and by email."  *Id*. Ex. 16, Deposition of James A. Kohlberg ("Kohlberg Depo.") 93:14-95:7.  Wright explained the reasons he thought bankruptcy was premature and implored him to reconsider, saying, "Do not walk away."  Roupinian Decl. Ex. 16.

Although Kohlberg recommended that the Board pursue bankruptcy, at the next meeting on April 1, 2014, the Board disregarded Kohlberg's decision and did not vote to file for bankruptcy protection.  Instead, the Board "authorized the pursuit of three potential plans for moving ClearEdge forward."  Eastburn Decl. ¶ 17.

Between March 31, when Wojciechowski alleges Kohlberg unilaterally decided to place ClearEdge in bankruptcy, and April 22, when the Board actually decided to cease operations and file for bankruptcy, the ClearEdge Board continued to engage in the decision-making process over multiple Board meetings.  Eastburn Decl., ¶¶ 19-20; Eastburn Reply Decl. ¶ 13, Exs. A-D.  The Board considered different ways to sustain ClearEdge's business, including continued negotiations with Samsung Everland to have the Contingency Covenant removed, pursuit of collections of cash from customer invoices, delaying the payment of vendor accounts, and raising debt and investment capital from multiple sources.  *See, e.g*., Eastburn Reply Decl., Ex. A-D.  During this time, ClearEdge regularly assessed these efforts and whether to proceed with bankruptcy. *See,*

*e.g.*, Eastburn Reply Decl., Ex. B.  For example, in the April 1, 2014 Board meeting agenda, the topics of discussion included reports from Wright and Gerbsman, explore sale opportunities, board duties and obligations, exercise of best good faith business judgment, exposure for breach of fiduciary duty, and Chapter 11 process timing and possible outcomes.  *Id.*

On April 6, 2014, Wright wrote a letter to the ClearEdge Board saying that he felt they were receiving "prejudiced advice" from the bankruptcy attorneys about the urgency of filing and stated that he will vote against a plan to file bankruptcy.  Roupinian Decl. Exs. 13 and 16, Kohlberg Depo. 108:5-110:3.  At a meeting that same day, the Board again voted not to file for bankruptcy at that time.  Eastburn Reply Decl. ¶ 7.  Instead, the Board asked Eastburn to draft "Plan C," which involved downsizing the business but continuing operations, as another option to explore and requested that ClearEdge seek additional financing sources.  *Id.*, Eastburn Decl. ¶¶ 17-19.  Thereafter, the Board worked on three plans pertaining to the future of ClearEdge: "Plan A" was to obtain additional capital, "Plan B" was to file bankruptcy, and "Plan C" was the new downsized business plan, which was delivered to the Board on April 18, 2014.  Eastburn Decl. ¶ 19.  In the April 18, 2014 Board meeting agenda, too, topics of discussion included a review of the recent sales activities and vendor accounts; the status of efforts to raise capital through Macquarie, Herbert, Gerbsman, and Kohlberg Ventures; a "Decision Point" regarding whether to file for bankruptcy; and the Plan C.  Eastburn Reply Decl. Ex. C.

With the $45 million in interim debt financing being uncertain, and not having obtained other sources of short-term financing beyond the $5 million loan from Kohlberg Ventures, ClearEdge faced running out of the funds required to operate.  Eastburn Decl. ¶ 18.  In early April 2014, the ClearEdge Board directed its funding consultant Baird to focus its attention on six to eight venture capital and private equity groups that might have an interest in investing in ClearEdge and could make decisions to invest quickly.  *Id.* ¶ 12. Starting in 2007, ClearEdge had retained the law firm Davis Polk & Wardwell as its outside corporate counsel and, in April 2014, again sought legal advice during the time period leading up to ClearEdge's bankruptcy filing.  *Id.* ¶ 18.  In addition, from April 6-8, 2014, Samsung Everland executives traveled to Northern California to meet with James Kohlberg, John Eastburn, and ClearEdge executives to continue

United States District Court
Northern District of California

1    discussions about the Contingency Covenant.  *Id*. ¶ 17.

2           In connection with the Board's Plan A, in early April 2014, Eastburn participated on a

3    conference call with Kohlberg, CFO Fan, Gavin Herbert, an existing ClearEdge shareholder not

4    affiliated with Kohlberg Ventures or any entity affiliated with James Kohlberg, and Bill Cox,

5    Herbert's financial advisor.  *Id*. ¶ 19. Following the early April 2014 call, ClearEdge worked with

6    one of Herbert's affiliates, Shea Ventures, on due diligence for potential financing.  *Id*. ¶ 19.

7    However, on April 22, 2014, Eastburn informed the Board by email that Shea Ventures declined

8    to invest in ClearEdge, explaining that in its experience with a clean-tech business with negative

9    gross margins, the amount and duration of the required financing commitment was indeterminate.

10   *Id*.

11          Finally, ClearEdge ran out of operating funds before it was able to satisfy the loan

12   conditions for the $45 million in interim debt financing or locate other financing.  *Id*. ¶ 20.

13   Wojciechowski points to a March 31, 2014 email from Fan to Wright, Kohlberg, Eastburn, and

14   Gerbsman to inform them that Macquarie Bank had approved the $20 million loan to ClearEdge,

15   Roupinian Decl. Ex. 13, but this was premature, as Macquarie subsequently made its financing

16   offer subject to the $25 million funding by the two Kohlberg Affiliates. Eastburn Reply Decl. ¶ 14

17   Ex. E.

18          On April 22, 2014, the full Board held a telephonic meeting and by unanimous Board vote,

19   made the decision to shut down ClearEdge's operations, file for Chapter 11 bankruptcy, and

20   authorize the discharge of employees not needed to sustain ClearEdge through the bankruptcy

21   process, including Wojciechowski and other employees at its South Windsor Facilities.  Eastburn

22   Decl. ¶ 20.  Kohlberg Ventures avers that the decisions to shut down ClearEdge's operations, file

23   for Chapter 11 bankruptcy, and implement the employment terminations at issue in this case were

24   made by a unanimous vote by the ClearEdge Board that followed Board procedures and not by

25   Kohlberg Ventures or any entity affiliated with James Kohlberg.  *Id*. ¶ 20.

26          However, Wojciechowski disputes this, asserting that the April 22 Board vote was just a

27   formality after the decision to file bankruptcy had already been unilaterally made by Kohlberg on

28   behalf of Kohlberg Ventures.  Roupinian Decl. Ex. 15. Wojciechowski also claims that the final

United States District Court
Northern District of California

1    bankruptcy decision had already been made by Kohlberg Ventures over the objection of Wright,

2    as demonstrated by the March 31, 2014 email from Wright to Kohlberg in which he wrote, "Jim, I

3    am absolutely amazed you made this decision without looking at alternatives and by email."

4    Deposition of James A. Kohlberg, 93:14-95:7, 108:5-110:3, Roupinian Decl. Ex. 16.

5         On April 24, 2014, ClearEdge closed its manufacturing operation in South Windsor,

6    Connecticut and terminated employees working there, after efforts to raise capital and financing

7    failed.  Hilderbrand Decl. ¶ 9; Eastburn Decl. ¶ 21.  Wojciechowski asserts ClearEdge did not shut

8    down on April 24, 2014 but kept operations open in order to market and sell itself in bankruptcy.

9         Along with other Board members, Kohlberg and Eastburn were involved in the preparation

10   of ClearEdge's WARN notice to employees, including the selection of employees to be

11   terminated, the language, timing, means of giving the notice, and other communications to

12   employees.  Roupinian Decl. Exs. 33 and 34; Eastburn Reply Decl. ¶ 8.  Wojciechowski, however,

13   argues that Kohlberg Ventures was in control of the WARN Act notice and points to two email

14   chains in particular that show (1) on April 19, 2014, Eastburn directed ClearEdge employee

15   Arianna Kalian to proceed with the reduction in force mass layoff on April 22, 2014, Roupinian

16   Decl., Ex. 10, and (2) on April 29, 2014, Eastburn sent an email to ClearEdge CFO Gloria Fan in

17   which he declared, "We should make an additional cut [in ClearEdge personnel] as soon as the

18   bankruptcy is filed" and states "[h]ere are the names that I think should be on the list."  *Id*.

19   Kohlberg Ventures responds that these are not directives but recommendations regarding the

20   employees to be terminated.

21        On April 25, 2014, Wojciechowski and class members were terminated without any

22   advance notice.  Plaintiff received a hand-delivered letter dated April 25, 2014 which states:

23   "Effective immediately, except to the extent there likely will be a small group involved in winding

24   up operations for the next 30 to 90 days, ClearEdge is permanently laying off all of its employees

25   at its South Windsor, Connecticut facilities, which includes you, and is closing its operations at

26   these locations... This unfortunately means that your employment is being terminated and has

27   ended at ClearEdge."  The April 25th Letter further states: "…ClearEdge has just learned that its

28   significant customer will not release its contract contingencies for many months.  Moreover, the

15

1    Company's potential lenders and equity investors similarly have declined to change their position

2    and finalize any additional financing or equity infusion.  Because these efforts have not been

3    successful, the Company has found itself in business circumstances that were not reasonably

4    foreseeable at an earlier time, and it instead has been placed in a position that it meets the

5    standards for consideration as a "faltering company" under the WARN Act."  Letter dated April

6    25, 2014, Ex. 35.

7         On May 1, 2014, ClearEdge initiated its Chapter 11 bankruptcy in the U.S. District Court

8    for the Northern District of California.  Hilderbrand Decl. ¶ 10.

9                              **III.   LEGAL STANDARD**

10        Summary judgment is proper where there is "no genuine dispute as to any material fact and

11   the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving

12   for summary judgment bears the initial burden of identifying those portions of the pleadings,

13   discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex*

14   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those that may affect the outcome

15   of the case, and a dispute as to a material fact is genuine if there is sufficient evidence for a

16   reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477

17   U.S. 242, 248 (1986).

18        If the moving party meets its initial burden, the opposing party must then set forth specific

19   facts showing that there is some genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477

20   U.S. at 250.  All reasonable inferences must be drawn in the light most favorable to the

21   nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587

22   (1986); *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).  However, it is not

23   the task of the Court "to scour the record in search of a genuine issue of triable fact."  *Keenan v.*

24   *Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden "to identify with

25   reasonable particularity the evidence that precludes summary judgment."  *Id.*  Thus, "[t]he district

26   court need not examine the entire file for evidence establishing a genuine issue of fact, where the

27   evidence is not set forth in the opposing papers with adequate references so that it could

28   conveniently be found."  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001);

United States District Court
Northern District of California

*Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 488 (9th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in briefs.") (citations omitted).

"While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (citing Fed. R. Civ. P. 56(c) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.")). To survive summary judgment, the nonmoving party "must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (citations omitted).

## IV.   DISCUSSION

### A.   The Requirements of the WARN Act

The WARN Act requires certain employers to provide sixty-days' notice to employees prior to a "plant closing" or a "mass layoff." 29 U.S.C. § 2102(a). An employer who fails to comply with the WARN Act's provisions is liable to each affected former employee for back pay and benefits for up to sixty days, plus attorney's fees. *Id.* § 2104(a).

A "plant closing" means "the permanent or temporary shutdown of a single site of employment ... if the shutdown results in an employment loss at the single site of employment during any 30–day period for 50 or more employees excluding any part-time employees." *Id.* § 2101(a)(2). A "mass layoff" means a reduction in force which—(A) is not the result of a plant closing; and (B) results in an employment loss at the single site of employment during any 30–day period for—(i) (I) at least 33 percent of the employees (excluding any part-time employees); and (II) at least 50 employees (excluding any part-time employees); or (ii) at least 500 employees (excluding any part-time employees). *Id.* § 2101(a)(3). Consequently, whether it is a plant closing or a mass layoff, when at least fifty full-time employees are affected, the WARN Act's notice requirement is triggered.

There is no dispute that the reduction in force and subsequent closure of ClearEdge's

17

1    South Windsor plant triggered the Act's notice requirement and that such notice was not provided

2    to Wojciechowski and the class.

3    **B.    "Single Employer" Status Determines Coverage by the WARN Act**

4            Under the "single employer" test, multiple companies may be treated as a single employer

5    under the WARN Act.  *Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1005–06 (9th Cir. 2004).

6    The WARN Act single employer doctrine incorporates the existing legal rules for this doctrine.

7    20 C.F.R. § 639.3(a)(2), *see also* DOL Preamble to 20 C.F.R. § 639.3(a), 54 Fed. Reg. 16,041, 045

8    (April 20, 1989) ("The intent of the regulatory provision relating to independent contractors and

9    subsidiaries . . . is intended only to summarize existing law that has developed under State

10   Corporations laws and such statutes as the [National Labor Relations Act] NLRA, the Fair Labor

11   Standards Act (FLSA) and the Employee Retirement Income Security Act (ERISA). … [T]he

12   regulation is not intended to foreclose any application of existing law or to identify the source of

13   legal authority for making determinations of whether related entities are separate...").

14           The "single employer" determination neither confers nor precludes statutory liability:  the

15   single employer test "does not determine joint liability . . . but instead determines whether a

16   defendant can meet the statutory criteria of an employer" for applicability of the relevant statutory

17   scheme.  *Anderson v. Pacific Maritime Association*, 336 F.3d 924, 928, 929 (9th Cir. 2003) (in

18   assessing coverage under Title VII, stating, "We use the integrated enterprise test to judge the

19   magnitude of interconnectivity for determining statutory coverage") (*citing Kang v. U. Lim. Am.,*

20   *Inc.*, 296 F.3d 810, 815–16 (9th Cir. 2002) (applying the "integrated enterprise" test in order to

21   determine whether two or more employers are so interrelated that they form an integrated

22   enterprise such that a defendant can meet the statutory criteria of an "employer" for Title VII

23   applicability)).  Accordingly, if analysis of the factors results in finding that two businesses are

24   functionally a "single employer" and are therefore covered under the statute, then liability of the

25   "single employer" may subsequently be assessed within the statutory framework.  *See, e.g., Chao*

26   *v. A-One Med. Servs., Inc.*, 346 F.3d 908, 917 (9th Cir. 2003) (affirming the district court's

27   application of the three-element, FLSA-specific definition of "enterprise" contained in 29 U.S.C. §

28   203(r)(1) to analyze whether two different organizational units could be grouped together as a

United States District Court
Northern District of California

18

1  "single enterprise" for the purpose of determining coverage under FLSA, § 207.)

2      Once the coverage determination has been made, then the analysis of liability for a

3  violation of the WARN Act may be made.  *See, e.g., Childress*, 357 F. 3d at 1007 (stating that "the

4  relevant factors, taken as a whole, support the district court's finding that [two companies]

5  operated as a single employer for the purposes of the WARN Act, and that the WARN Act applies

6  to their conduct.").  Hence, Kohlberg Ventures' argument that a determination of status as a

7  "single employer" cannot form the basis of a subsequent finding of liability is going a step too far.

8  If the WARN Act applies to an employer's conduct, then violation of the WARN Act subjects that

9  employer to liability to those hurt by such conduct.

10      Here, there is no dispute that the WARN Act applies to ClearEdge and that, with only one

11  Member and one Manager, Kohlberg Ventures would not, on its own, be covered by the Act.

12  However, if ClearEdge and Kohlberg Ventures are determined to be a single employer, the

13  WARN Act would apply equally to Kohlberg Ventures.

**C.      The "Single Employer" Test**

15      Under the WARN Act, independent contractors and subsidiaries which are wholly or

16  partially owned by a parent company are treated as separate employers or as a part of the parent or

17  contracting company "depending upon the degree of their independence from the parent."  20

18  C.F.R. § 639.3(a)(2).  "Some of the factors to be considered in making this determination are (i)

19  common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv)

20  unity of personnel policies emanating from a common source, and (v) the dependency of

21  operations."  *Id.*  The first factor is the "least important," and the other factors are "guideposts

22  only."  *Childress*, 357 F.3d at 1005. The inquiry "ultimately depends on all the circumstances of

23  the case and is characterized as an absence of an arms-length relationship found among

24  unintegrated companies."  *Id.* at 1005–06.

25      There must be a "fact-specific inquiry whereby the court must determine from a

26  multiplicity of criteria whether the operations of the parent and subsidiary are so interrelated as to

27  find an absence of an arm's length relationship between unintegrated companies."  *Childress v.*

28  *Darby Lumber Inc.*, 126 F. Supp. 2d 1310, 1314 (D. Mont. 2001) (simplified), *aff'd*, 357 F.3d

1000 (9th Cir. 2004). "[T]he basic point of the inquiry is clear:  has [the parent company] structured its relationship with [the subsidiary company] in such a fashion as to control [the subsidiary company] and, at the same time, avoid [the parent's] obligations under federal law?" *Int'l Bhd. of Teamsters v. American Delivery Service, Co.*, 50 F.3d 770, 776 (9th Cir. 1995).

The Court discusses each of the "single employer" factors, reserving the "de facto control" discussion for last, and turning finally to what the inquiry "ultimately depends on," that is, whether the totality of circumstances demonstrate an arms-length relationship between the companies.

### 1.      Common Ownership

As to the first, "least important" factor, no issue of fact has been raised regarding common ownership of the two companies.  "[J]ust as a parent will not be held liable solely because of its ownership of the subsidiary, so too a lender will not be liable solely because of the financial dependence that necessitated the loan in the first place." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 496 (3rd Cir. 2001) (affirming summary judgment dismissing WARN Act "single employer" claim because the plaintiff's evidence did not establish the "high degree of integration" required).  It is well established that stock ownership alone is not grounds for holding a parent liable for its subsidiary's actions.  *See United States v. Bestfoods*, 524 U.S. 51, 61–62 (1998) ("the exercise of the control which stock ownership gives to stockholders . . . will not create liability beyond the assets of the subsidiary.  That control includes the election of directors, the making of by-laws . . . and the doing of all other acts incident to the legal status of stockholders.")

Wojciechowski argues that Kohlberg Ventures controlled ClearEdge because other entities that were affiliated with Kohlberg Ventures' owner, James Kohlberg, collectively owned a majority of ClearEdge's shares.  It is undisputed, though irrelevant, that James Kohlberg himself, through various entities he controlled, owned around two-thirds[3] of ClearEdge stock, including the 3% owned by Kohlberg Ventures.  The only defendant in this case is Kohlberg Ventures, and the

---

[3] The parties differ slightly on exactly how much of ClearEdge's stock Kohlberg owned through these entities.  Plaintiffs say it amounted to 69% (Roupinian Decl., Ex. 2), and Kohlberg Ventures states it was 66%.  Eastburn Decl., ¶ 4.  The difference between 69% and 66% is not material to this motion.

United States District Court
Northern District of California

sole issue to be determined in this motion is whether Wojciechowski can set forth specific facts showing that there is some genuine issue for trial regarding whether *Kohlberg Ventures* and ClearEdge were a "single employer" for purposes of coverage under the WARN Act.

It is undisputed that Kohlberg Ventures itself owned only 3% of ClearEdge stock, a small ownership stake.  Stock ownership alone, much less such minimal ownership, does not provide grounds to hold the stock owner liable for the actions of the owned company.

It is likewise undisputed that Kohlberg Ventures made only one loan to ClearEdge of $5 million, a fraction of the $45 million sought to keep ClearEdge afloat in its last months and a tiny fraction of the $130 million already lent to ClearEdge by other Kohlberg-controlled entities.  This relatively low loan amount does not lend itself to a finding of liability just because ClearEdge had some degree of financial dependence on Kohlberg Ventures.  Accordingly, Kohlberg Ventures' minimal ownership interest in ClearEdge and relatively small loan weigh against finding that Kohlberg Ventures and ClearEdge were a "single employer."

**2.        Common Directors and/or Officers**

As to the second factor, it is undisputed that CEP Inc. and Kohlberg Ventures do share some common directors and/or officers.  This factor assesses "whether the two nominally separate corporations: (1) actually have the same people occupying officer or director positions with both companies; (2) repeatedly transfer management-level personnel between the companies; or (3) have officers and directors of one company occupying some sort of formal management position with respect to the second company." *Pearson*, 247 F.3d at 494, 498.

In analyzing this factor, the Court bears in mind, as Kohlberg Ventures points out, that "the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003).  Indeed, the U.S. Supreme Court has found that "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *Bestfoods*, 524 U.S. at 69; *see also Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (C.A.2 1929) (L. Hand, J.) ("Control through the ownership of shares does not fuse the corporations, even when the directors are common to each.").  Furthermore, "courts generally presume that the directors are

21

wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary."

*Bestfoods*, 524 U.S. at 69.

Wojciechowski asserts that Kohlberg Ventures exerted significant influence on ClearEdge's Board actions because both Kohlberg Ventures' Kohlberg and Eastburn served on multiple Board committees. As of February 18, 2014, two of the three seats on ClearEdge's executive and compensation committees were held by Kohlberg and Eastburn and they each held one of the three seats on both ClearEdge's nominating committee and audit committee.

However, there is a distinction between the roles Kohlberg and Eastburn occupied as representatives of Kohlberg Ventures and as members of the Board. The fact that Kohlberg and Eastburn were both affiliated with an entity that owned some ClearEdge stock, Kohlberg Ventures, and that they also served as directors of the ClearEdge Board fails to weigh this factor in favor of Wojciechowski for WARN Act purposes. Performing acts incident to the legal status of stockholders, such as serving on the Board of Directors, does not create liability beyond the assets of the subsidiary. Wojciechowski has put forth no evidence to show that these Board members wore their 'Kohlberg Ventures hats' rather than their 'ClearEdge hats' when acting on behalf of ClearEdge.

Neither has Wojciechowski produced any evidence that Kohlberg Ventures and ClearEdge repeatedly transferred management-level personnel between the companies or that officers and directors of one company occupied a formal management position at the second company. Although Eastburn twice served as interim COO for CEP Inc., for four months in 2012 and three weeks in 2014, there is no evidence that this temporary role was anything more than a pragmatic effort to fill a personnel gap.

Wojciechowski asserts that Kohlberg Ventures exerted outsized control over ClearEdge through Board members Angelides, Geisse, and Wright both because they had prior business and/or personal relationships with Kohlberg and because Kohlberg recommended them for Board membership. However, of the five Board members besides Eastburn and Kohlberg, none were ever employed or retained by, or otherwise affiliated with, Kohlberg Ventures or any Kohlberg Entity. Kohlberg Ventures asserts that Board members were selected based on their subject matter

22

expertise and perceived value to ClearEdge.  ClearEdge hired a search firm to locate potential Board members and Kohlberg introduced individuals to the Board only to see if the Board was going to consider their membership.

Kohlberg Ventures contends that, as a result, a supermajority of the ClearEdge Board of Directors – five of the seven members – was unaffiliated with Kohlberg Ventures or James Kohlberg.  Eastburn avers that neither he, Kohlberg Ventures, James Kohlberg, nor any entity affiliated with James Kohlberg had an agreement with any member of the ClearEdge Board to vote any particular way on matters subject to a ClearEdge Board vote.

At this point, the Court must differentiate between reasonable inference and innuendo.  Whereas the former creates a genuine issue of material fact and precludes summary judgment, the latter amounts to less than a scintilla of evidence.  That Kohlberg knew or recommended some of the other Board members, that Kohlberg and Eastburn served on multiple Board committees, that Eastburn served for a few months as interim COO – none of these facts may reasonably be interpreted to indicate the high degree of integration that would tip the common directors and officers factor in favor of a finding that the companies were a "single employer."

### 3.     Unity of Personnel Policies Emanating From A Common Source

It is undisputed that Kohlberg Ventures and ClearEdge personnel policies emanated from different sources.  Kohlberg Ventures presented undisputed evidence that neither Kohlberg Ventures nor any entity affiliated with James Kohlberg ever shared a human resource information system or other personnel, benefits, recordkeeping, or payroll system with ClearEdge, nor did the two companies otherwise share common personnel practices.  Indeed, ClearEdge had its own Human Resources department, employed its own Human Resources staff that did not work for or provide services to Kohlberg Ventures and, at various times, employed a Vice President of Human Resources who, along with the Human Resources department, managed ClearEdge's labor relations.  ClearEdge established the employment terms and conditions governing its employees through its employee handbook that Kohlberg Ventures was not involved in drafting or enforcing.

It is also undisputed that Kohlberg Ventures and ClearEdge did not jointly train their employees, nor did they share training or instruction policies/practices.  ClearEdge trained its own

employees without assistance from Kohlberg Ventures.  Specifically, neither Kohlberg Ventures nor any entity affiliated with James Kohlberg had any involvement in hiring, training, disciplining or supervising ClearEdge employees or otherwise providing training or instruction policies/practices.  At no time has Kohlberg Ventures employed, retained or utilized any ClearEdge employee to provide services at Kohlberg Ventures, and neither Kohlberg Ventures nor any entity affiliated with James Kohlberg ever had a Shared Services Agreement with ClearEdge.

Wojciechowski asserts that Kohlberg Ventures, through Eastburn, dictated personnel policies, while Kohlberg Ventures contends that Eastburn's involvement in these activities was either in his role as a Board member or as the interim COO.  Eastburn's activities about which Wojciechowski complains and the role in which they were performed are: (1) preparing bonus recommendations for ClearEdge employees in his capacity as a member of the Compensation Committee of the Board, (2) setting agendas for ClearEdge management meetings and board meetings in his role as Board Secretary and interim COO respectively, and (3) advising on next steps regarding ClearEdge's intellectual property counsel performed as ClearEdge's interim COO, with the knowledge of ClearEdge's CFO and only because ClearEdge's in-house counsel was no longer employed by ClearEdge at the time.

Wojciechowski further claims that Kohlberg and Eastburn were involved in the preparation of ClearEdge's purported WARN notice to employees, including the selection of which employees would be terminated, the language and timing of the notice, and other related communications to employees.  Specifically, Wojciechowski argues that, on April 19, 2014, Eastburn directed ClearEdge employee Arianna Kalian to proceed with the reduction in force mass layoff on April 22, 2014 and, on April 29, 2014, Eastburn sent an email to ClearEdge CFO Gloria Fan in which he directs her to make more personnel cuts and who should be cut.  There is no evidence, however, that Eastburn's emails are directives but rather are recommendations with merely suggestive language such as "[h]ere are the names that I think should be on the list."

Given the small number of people affiliated with Kohlberg Ventures (two people), the small ClearEdge Board (seven people), and even smaller ClearEdge executive team (three people), it is not surprising that multiple roles fell to the same people.  Without even a scintilla of evidence

1   contradicting the presumption of actions taken in appropriate roles, Wojciechowski's arguments

2   are no more than that, pure argument.  In the absence of evidence to the contrary, the Court

3   presumes Eastburn conducted these activities while wearing his ClearEdge 'hat.'  Hence,

4   Wojciechowski has raised no issues of material fact regarding this factor.

5           **4.      Dependency of Operations: Financial Entanglements, Purchase and Sale of
                      Goods**

6

7           As to the degree the two companies' operations were independent, Wojciechowski has

8   presented no evidence of dependence by either on the other.  Kohlberg Ventures has submitted

9   undisputed testimony that neither Kohlberg Ventures nor any entity affiliated with James

10  Kohlberg ever shared administrative or purchasing systems with ClearEdge, interchanged

11  supervisors or equipment with ClearEdge, commingled finances with ClearEdge – no joint bank

12  accounts nor access to each other's bank accounts or finances, never served as a guarantor of loans

13  or credit extended to ClearEdge or vice versa, never owned any real property or equipment

14  together with ClearEdge, and did not rented or leased real property or equipment to or from

15  ClearEdge.  ClearEdge did not purchase goods from or sell goods to Kohlberg Ventures, nor did it

16  share equipment or property with Kohlberg Ventures.  Neither Kohlberg Ventures nor any entity

17  affiliated with James Kohlberg ever had any involvement in writing, approving, or negotiating

18  purchase orders, bidding on projects, approving projects, facilitating sales, or procuring equipment

19  or materials with or for ClearEdge.

20          Wojciechowski, for his part, asserts that, in 2014, Eastburn was involved in the operations

21  of ClearEdge, including management of the sales process and contractors, attempting to imply

22  some level of dependence between Kohlberg Ventures and ClearEdge operations.  For example,

23  he points to an email to ClearEdge personnel on March 10, 2014 in which Eastburn wrote, "I've

24  been asked to review the cycle - what we buy, from whom, controls, how we change part #s,

25  inventory, required purchasing timeframes etc.  In our meeting I'd like to dig in to the relevant

26  processes, review the agreements with our vendors, understand your organization, map to

27  engineering."

28          However, this scenario, along with many others about which Wojciechowski complains,

United States District Court
Northern District of California

occurred during the period when Eastburn was acting COO and all occurred when he was a Board member.  Accordingly, Eastburn must have "been asked" to evaluate ClearEdge's operations in one or the other of these roles.  Hence, with no evidence indicating otherwise, Wojciechowski improperly attributes to Kohlberg Ventures the activities Eastburn performed in his capacity as a ClearEdge Board member and/or as interim COO.  No inference has thus been created that the two companies' operations bore any relationship whatsoever to each other, much less a relationship of dependency.  Accordingly, no reasonable fact finder could find that this factor weighs in Wojciechowski's favor.

### 5.    De Facto Exercise of Control

Wojciechowski has made many arguments regarding Kohlberg Ventures' alleged control over ClearEdge, many of which have already been addressed.  However, the pith of his argument concerning de facto control is that Kohlberg, as a representative of Kohlberg Ventures, made the decision by himself, without consulting the ClearEdge Board or its CEO, to file bankruptcy and put ClearEdge out of business, the very action giving rise to the violation of the notice requirement of the WARN Act.  The evidence submitted, however, proves otherwise.

Wojciechowski argues that Kohlberg consulted with bankruptcy counsel without input from other members of the ClearEdge Board but, in making this claim, he ignores the March 22 Board meeting at which the experience and credentials of the Dorsey lawyers were presented to the Board.  Only after that Board meeting, on March 24, 2014, did Eastburn ask O'Neill to send an engagement letter and only after another several days did Kohlberg authorize his formal retention.

Furthermore, while it is undisputed that on March 31, 2014 Kohlberg did take it upon himself to tell O'Neill to prepare to file for bankruptcy, Kohlberg Ventures has indisputably demonstrated through emails, Board agendas, and testimony that the ClearEdge Board essentially disregarded Kohlberg's decision and voted against declaring bankruptcy at the April 1, 2104 meeting.  Kohlberg Ventures has presented ample evidence that the Board continued to engage in the decision-making process over multiple Board meetings between March 31, when Wojciechowski alleges Kohlberg – and therefore Kohlberg Ventures – unilaterally decided to place ClearEdge in bankruptcy, and April 22, when the Board actually decided to cease operations

1    and file for bankruptcy.

2        The Board continued to formulate all three plans – A, B, and C – and to explore whatever

3    options they could think of.  The Board pursued multiple ways to sustain ClearEdge's business,

4    including continued negotiations with Samsung to have the Contingency Covenant removed,

5    pursuit of collections from customer invoices, delayed payment of vendor accounts, and raising

6    debt and investment capital from multiple sources, as well as regularly assessing whether to

7    proceed with Plan B, bankruptcy.  The April 1, 2014 Board agenda, for example, included reports

8    from Wright and Gerbsman, exploration of sale opportunities, board duties and obligations,

9    exercise of best good faith business judgment, exposure for breach of fiduciary duty, and Chapter

10   11 process timing and possible outcomes.

11       At the April 6, 2014 meeting, the Board again voted not to file for bankruptcy at that time.

12   Instead, the Board asked Mr. Eastburn to draft a whole new plan, "Plan C," a downsized business

13   plan to be delivered to the Board on April 18, 2014, and requested that ClearEdge seek additional

14   financing sources.  In the April 18, 2014 Board meeting agenda, too, the topics of discussion

15   included a review of the recent sales activities and vendor accounts; the status of efforts to raise

16   capital through Macquarie, Herbert, Gerbsman, and Kohlberg Ventures; a "Decision Point"

17   regarding whether to file for bankruptcy; and discussion of the new Plan C.

18       Wojciechowski, in contrast, has presented no evidence that the ClearEdge Board bent to

19   pressure from Kohlberg Ventures, Kohlberg, or Eastburn to declare bankruptcy a moment sooner

20   than its members themselves unanimously decided it was time to do so.  Accordingly,

21   Wojciechowski's central argument for Kohlberg Ventures' de facto control of ClearEdge fails, as

22   he has failed to establish any genuine issue of material fact with regard to this factor.

23       **6.      Totality of the Circumstances**

24       Finally, there are no genuine issues of fact as to the totality of the circumstances and the

25   presence of an arms-length relationship between Kohlberg Ventures and ClearEdge.  In the end,

26   the single employer inquiry "ultimately depends on all the circumstances of the case and is

27   characterized as an absence of an arms-length relationship found among unintegrated companies."

28   *Pearson*, 247 F.3d at 505.  The DOL single employer factors, like the integrated enterprise test,

United States District Court
Northern District of California

27

require that two corporations be "highly integrated with respect to ownership and operations" before they will be considered a single employer for WARN Act purposes. *Id.*

There is no question that Kohlberg Ventures and ClearEdge remained entirely separate business entities at all times and that they did not rely on each other for personnel, equipment, facilities, clients, administrative services, or any of the other various resources typically "shared" between companies that are found to be entwined for purposes of shared liability. Once more, Wojciechowski has presented no evidence to the contrary.

Wojciechowski attempts to paint a picture of a minor investor so dominating the company in which it made a small investment that it eliminated the distinction between the two. Wojciechowski repeatedly mischaracterizes evidence in order to make it appear that Kohlberg or Eastburn made decisions on their own without consulting the Board, most importantly about the decision to declare bankruptcy. This attempt ignores the abundant evidence that the Board – including Kohlberg and Eastburn – worked as a team to explore options for how to continue ClearEdge's business, including continued negotiations with Samsung, collections of customer invoices, delaying the payment of bills, and raising capital. The evidence also demonstrates a robust back-and-forth among Kohlberg Ventures, ClearEdge Board and ClearEdge employees regarding whether and when to declare bankruptcy. Particularly telling is Wright's April 6, 2014 letter cautioning the Board saying that he felt they were receiving "prejudiced advice" about the urgency of bankruptcy filing and that he will vote against filing. At the Board meeting that day and at several others, the Board did not, in fact, vote to file for bankruptcy. A louder repudiation of Kohlberg Ventures' purported control is hard to imagine.

In addition, Wojciechowski resorts to assertions of questionable veracity designed to make it appear that Kohlberg Ventures wielded a lot more power than it did, mischaracterizes evidence and, at times, appears to make things up from whole cloth. Wojciechowski makes conclusory arguments that Kohlberg Ventures was primarily responsible for the financial crisis that resulted in ClearEdge's eventual bankruptcy filing. For example, Wojciechowski asserts that, in a March 25, 2014 letter to an executive vice president of Samsung Everland, Wright informed him that Kohlberg Ventures balked at the demand for its continued financial support of ClearEdge and

1   demanded that Samsung remove the contingency and sign an unconditional purchase order.  This

2   assertion is untrue and seems designed to create a factual dispute where there is none.

3       In further attempts to cast Kohlberg Ventures as imposing ultimatums and unreasonable

4   funding conditions, Wojciechowski mischaracterizes an April 4th letter from Wright to Samsung

5   Everland as stating that it would have to consent to an unconditional purchase order without a

6   contingency clause.  However, Wright's letter provided two alternatives for the Samsung Everland

7   and ClearEdge relationship to proceed.  Similarly, Wojciechowski inserts into an April 5, 2014

8   email from Wright to his colleagues a claim about Kohlberg Ventures' insistence on an

9   unconditional binding commitment which simply does not appear in the email.  Wojciechowski

10  also asserts inaccurately that on April 13, 2014, Kohlberg Ventures demanded that Samsung

11  Everland remove the Contingency Covenant when in fact it stated that Kohlberg Ventures was

12  ready to fund ClearEdge within days of Samsung Everland's unconditional offer.  The April 14,

13  2014 letter from Samsung Everland likewise did not decline to remove the contingency but instead

14  stated that the irrevocable purchase order "should be issued by the end of May."

15      Wojciechowski's conclusory characterizations are not supported by the record.  Indeed,

16  there is a dearth of evidence to support Wojciechowski's argument that Kohlberg Ventures exerted

17  a pervasive control over ClearEdge's functioning and the evidence submitted does not lend itself

18  to reasonable inferences to this effect.  The evidence proffered by Wojciechowski simply does not

19  establish the high degree of integration required to find the companies are a single employer.

20  Even viewed in the light most favorable to Wojciechowski, the evidence submitted fails

21  demonstrate the absence of an arms-length relationship required to tip this factor in his favor.

22      No genuine issues of material fact remain as to whether these five factors and the totality

23  of circumstances weigh heavily against finding that ClearEdge and Kohlberg Ventures are a single

24  employer.  As a result, the WARN Act does not apply to Kohlberg Ventures.  Thus, Kohlberg

25  Ventures is not subject to liability alongside ClearEdge for failure to provide the statutorily

26  required notice.

27                          **V.   CONCLUSION**

28      Based on the analysis above, the Court hereby **GRANTS** Kohlberg Ventures' Motion for

29

1    Summary Judgment on Wojciechowski's WARN Act claim.  Wojciechowski's Cross-Motion for

2    Summary Judgment is **DENIED** as moot.

3            The Court orders the parties to meet and confer and file a proposed form of judgment

4    within 14 days.  *See* Fed. R. Civ. Proc. 23(c)(3).  If they cannot agree on a proposed form of

5    judgment, then within 14 days they shall file competing proposed forms of judgment and a joint

6    letter brief not to exceed five pages setting forth their respective positions.

7            **IT IS SO ORDERED.**

8

9    Dated: April 9, 2021

10

11                                                                   THOMAS S. HIXSON
                                                                     United States Magistrate Judge